## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ADAM TITUS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:17-cv-01297-GCS** |
| | ) | |
| **DAVID MITCHELL,** | ) | |
| **SHAUN REIMAN,** | ) | |
| **BRADLEY SADLER,** | ) | |
| **DONNIE KELLER,** | ) | |
| **JOHN HARRISON,** | ) | |
| **JOHN TOURVILLE,** | ) | |
| **GEORGE WELBORN,** | ) | |
| **WILLIAM QUALLS,** | ) | |
| **KELLIE ELLIS,** | ) | |
| **JAMES RIGDON,** | ) | |
| **LUCAS MAUE,** | ) | |
| **DANIEL LEE,** | ) | |
| **JAMES MALLORY[1],** | ) | |
| **PHILLIP SHIELDS,** | ) | |
| **CLETUS MCGEE,** | ) | |
| **MARTHA M. OAKLEY** | ) | |
| **and JACQUELINE LASHBROOK,** | ) | |
| | | |
| **Defendants.** | | |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

### INTRODUCTION AND BACKGROUND

On November 30, 2017, Plaintiff Adam Titus, an inmate in the custody of the

Illinois Department of Corrections ("IDOC"), filed suit pursuant to 42 U.S.C. § 1983

---

[1] Throughout the course of this litigation and in the parties' pleadings regarding the partial motion for summary judgment, Defendant James Mallory is referred to as "Malloy" and "Mallory." The Court will utilize "Mallory" throughout this Memorandum & Order as that is the name contained in the documents in support of the motion for partial summary judgment despite being named in the caption of the Second Amended Complaint and in some of the pleadings as "Malloy."

against Defendants after a multi-person assault on the yard at Menard Correctional Center ("Menard") on June 16, 2017. (Doc. 1). In his original complaint, Plaintiff alleged that on June 16, 2017, Plaintiff was "tackled by three prison guards (John Does [1-3]) and slammed to the ground." *Id.* Plaintiff was restrained, and John Does 1-3 punched him in the face and back repeatedly; they also squeezed the handcuffs while placing Plaintiff in a headlock and twisting his wrist. *Id.* Lieutenant Mitchell walked up to Plaintiff and kicked him in the face, grabbed him by the leg, and twisted it. *Id.*

"Plaintiff was taken to healthcare by two prison guards (John Does [4-5]), while Plaintiff repeatedly requested medical attention as Plaintiff complained of not being able to see out his left eye to mental health (Jane Doe)." (Doc. 1, p. 13-14). Plaintiff was seen by a Med-Tech (Jane Doe [1]), who noted that Plaintiff was bleeding from his face and head. (Doc. 1, p. 14). A group of prison guards (John Does 6-8) then entered and began to punch and knee Plaintiff in the back, face, and head. *Id.* Plaintiff was then dragged to segregation, as three prison guards kneed and punched Plaintiff and called him derogatory names. *Id.* Plaintiff was taken to the shower in segregation as he repeatedly asked four guards (John Does) for medical attention. *Id.* Plaintiff was then placed in a cell, and minutes later a sergeant (Sergeant John Doe 1) and gallery officer (C/O John Doe 9) took Plaintiff to Med-Tec Jane Doe [2] and Med-Tech Jane Doe [3]. *Id.* Plaintiff tried to explain his injuries to the medical staff, but he was ignored. *Id.* Plaintiff was then taken back to his cell, and Sergeant John Doe 1 twisted Plaintiff's wrist as Plaintiff directed requests for medical attention to Sergeant John Doe 1 and C/O John Doe 9. (Doc. 1, p. 15).

Thereafter, Plaintiff, by and through appointed counsel, filed a Second Amended Complaint on May 2, 2019, containing the following five counts:

**Count 1**:  Cruel and unusual punishment – excessive force against Defendants Shaun Reiman, Bradley Sadler, Donnie Keller, John Harrison, John Tourville, George Welborn, William Qualls, Kellie Ellis, Lucas Maue, Daniel Lee, James Mallory, Phillip Shields, David Mitchell, James Rigdon and Cletus McGee on June 16, 2017;

**Count 2**:  Cruel and unusual punishment – failure to intervene against Defendants Shaun Reiman, Bradley Sadler, Donnie Keller, John Harrison, John Tourville, George Welborn, William Qualls, Kellie Ellis, Lucas Maue, Daniel Lee, James Mallory, Phillip Shields, David Mitchell, James Rigdon, Cletus McGee, and Martha Oakley on June 16, 2017;

**Count 3**:  Deliberate indifference to serious medical need against all named Defendants on June 16, 2017;

**Count 4**:  State law claim of battery against Defendants Shaun Reiman, Bradley Sadler, Donnie Keller, John Harrison, John Tourville, George Welborn, William Qualls, Kellie Ellis, Lucas Maue, Daniel Lee, James Mallory, Phillip Shields, David Mitchell, James Rigdon and Cletus McGee on June 16, 2017; and

**Count 5**:  State law claim of assault against Defendants Shaun Reiman, Bradley Sadler, Donnie Keller, John Harrison, John Tourville, George Welborn, William Qualls, Kellie Ellis, Lucas Maue, Daniel Lee, James Mallory, Phillip Shields, David Mitchell, James Rigdon and Cletus McGee on June 16, 2017.

(Doc. 108). Also, in his Second Amended Complaint, Plaintiff designates some of the named Defendants as follows: Reiman, Sadler, Keller, Harrison, Tourville, Welborn, Qualls, Ellis, Maue, Lee, Mallory and Shields as "Correctional Officer Defendants" and Rigdon and McGee as "Sergeant Defendants." (Doc. 108, p. 2).

Plaintiff alleges that on June 16, 2017, Defendants were agitated and sought to provoke Plaintiff and other inmates when Defendants began to shake down inmates including Plaintiff. During this period, Plaintiff maintains that he complied with all

orders and requests from staff. While the altercation with other inmates was taking place, Defendants tackled Plaintiff and placed him in restraints and then began to beat Plaintiff.

Plaintiff further alleges that he was assaulted on the way to the healthcare unit, that he was assaulted while at the healthcare unit, and on the way to restrictive housing after being taken from the healthcare unit. Plaintiff contends that he suffered physical injuries, *i.e.*, injury and damage to his left eye, as well as mental and emotional injuries; he seeks monetary damages for these injuries. (Doc. 108).

Pending before the Court is Defendants' partial motion for summary judgment. (Doc. 168, 169, 174). Defendants maintain there are no facts to support Plaintiff's claims as to the altercation on the yard and the transport to healthcare; no facts to support Plaintiff's claims in Counts 1-5 against Defendants Mitchell, Reiman, Tourville, Maue, Lee, and Mallory, and no facts to support Plaintiff's claims in Count 3 against Lashbrook and Oakley. Plaintiff opposes the motion. (Doc. 172).[2] Based on the reason delineated below, the Court **GRANTS in part** and **DENIES in part** the motion for partial summary judgment.

---

[2]      Plaintiff states in his opposition: "Defendants filed a Motion for Partial Summary Judgment seeking only to dismiss Count III against Defendants Lashbrook and Oakley and all claims against Defendants Lee, Reiman, Mallory, and Tourville – these are the only claims Plaintiff's present opposition responds to." (Doc. 172, p. 2).

## FACTS[3]

The following facts are taken from the record and presented in the light most favorable to Plaintiff, the non-moving party, and all reasonable inferences are drawn in his favor. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

During the relevant time alleged in the complaint, Plaintiff was an inmate of the Illinois Department of Corrections ("IDOC") housed at Menard. Defendant Jacqueline Lashbrook was the warden of Menard. Defendant Martha Oakley was employed as a correctional medical technician and nurse at Menard. Defendant David Mitchell was employed at Menard as a lieutenant. The Correctional Officer Defendants were employed at Menard as employees in the position of lieutenant, sergeant, or correctional officer. Defendants James Rigdon and Cletus McGee were employed at Menard as sergeants.

On June 16, 2017, Plaintiff was participating in recreational activities at the Menard gym with other inmates. After the recreation period ended, Plaintiff and the other inmates were led from the gym area back to the West Cell House. Prior to escorting inmates to the West Cell House, and unbeknownst to Plaintiff or the inmates that were present in the gym, a physical altercation occurred between another inmate and the Correctional Officer Defendants, Lieutenant Mitchell, and the Sergeant Defendants.

While Plaintiff was being led from the gym area, Plaintiff claims he was approached by the Correctional Officer Defendants, Lieutenant Mitchell, Cletus McGee

---

[3]     The Court notes that the sequence of events and how the altercations/incidents happened as presented by the parties have created two largely inconsistent versions of the facts at issue. The Court further notes that these facts are directed to the issues raised by the parties.

and James Rigdon, who began to "shake down" and harass Plaintiff and the other inmates. During the "shake down," a physical altercation broke out between the Correctional Officer Defendants, Lieutenant Mitchell, and the Sergeant Defendants and another inmate who was being led to the West Cell House.

Plaintiff left the pat down search area and ran to the area where staff was attempting to restrain an individual in custody. Plaintiff was given orders to lie on the ground, but he did not comply. Instead, he charged a group of staff members and struck them in various areas of the back, head, face, and torso. Plaintiff was physically restrained with mechanical restraints after Plaintiff refused several direct orders to stop resisting.

At the Adjustment Committee hearing, Plaintiff admitted to striking the staff. During the initial altercation, Plaintiff was combative and disobeyed orders. He was found guilty of assault with injury and dangerous disturbance. He received restrictions to his visits, audio/visual and contact visits, C Grade, restrictive housing, and good conduct credit revocation of three (3) months which was later reduced to one (1) month.

In his Second Amended Complaint, Plaintiff alleges that Defendants were agitated and sought to provoke altercations. Plaintiff also asserts that he complied with all staff orders. In his deposition, Plaintiff denied striking any staff member. The findings by the Adjustment Committee regarding the first altercation contradict Plaintiff's Second Amended Complaint and his deposition testimony.

Plaintiff alleges that Defendants Lee and Reiman grabbed and tackled him to the ground and that Defendant Lee placed him in a headlock while Defendant Reiman handcuffed him. Plaintiff further asserts that while he was on the ground, Defendants

Tourville, Mallory and Maue jumped into the altercation. Thereafter, Defendants Lee, Reiman, Tourville, Hughes, Mallory, and Maue repeatedly punched Plaintiff in the face and body and beat him in the back. Additionally, Defendant Reiman squeezed and twisted Plaintiff's wrists in the handcuffs. Subsequently, Defendant Mitchell approached Plaintiff, kicked Plaintiff in the face, and grabbed Plaintiff's leg and twisted it. Plaintiff also contends that none of the Defendants attempted to intervene, stop, or prevent the other Defendants from assaulting Plaintiff.

According to Plaintiff, after the initial assault ended, Plaintiff asked for medical attention and was taken to the healthcare unit in handcuffs by Defendants Lee, Reiman, Mallory, Maue and Tourville. On the way to healthcare, these Defendants continued to twist his wrists, as well as kick and beat him in the back.

Upon arriving at healthcare, Plaintiff requested medical attention and complained that he could not see out of his left eye; he also complained of a headache. At this time, a different group of Correctional Officers entered the healthcare unit and assaulted Plaintiff. They punched the Plaintiff and kneed him in the back, face, and head, while calling him racial slurs. Again, Plaintiff claims that no one attempted to stop, assist, intervene, or otherwise impede the attack on Plaintiff.

Instead of being seen by healthcare, Plaintiff was dragged by these Correctional Officers from the healthcare unit to segregation. These officers continued their assault until they placed Plaintiff in the shower area in segregation.

Plaintiff claims he repeatedly asked for medical treatment, but the Correctional Officer Defendants ignored his requests. Thereafter, Plaintiff was taken to a room in

segregation where medical technicians Cassandra Chitty and Defendant Oakley waited to assess him.

After the altercation, Plaintiff saw Defendant Oakley. Defendant Oakley prepared the June 16, 2017 medical record regarding Plaintiff. The medical record indicates that Plaintiff had an injury to his eyes, that he had minimal blood loss, and that it was a pin point open area injury. Further, the medical record indicates that there was no swelling or edema, no disfigurement or loss of range of motion, and no signs of impaired circulation. Additionally, the medical record reflects that Plaintiff's vitals were: Temperature 98.2; Pulse 72; Respiration 16; and Blood Pressure 126/80. These vital signs are indicative of a resting person and are not indicative of high pain, stress, or exertion. According to Defendant Oakley's Declaration, Plaintiff did not relay any serious medical condition to her, she did not observe any serious medical condition on Plaintiff, and the medical record was prepared based on the medical visit with Plaintiff.

Plaintiff testified that once he arrived at healthcare, he immediately requested medical attention and noted that he could not see out of his left eye; he also complained of a headache. Plaintiff further described other physical issues, including leg pain, to Defendant Oakley. Plaintiff asserts that he was ignored when he tried to explain his injuries to Defendant Oakley. Before ordering that Plaintiff be taken away, Defendant Oakley merely mentioned to Plaintiff that he was bleeding from his face and head and asked him if any of his bones were sticking out.

Plaintiff alleges that after seeing Defendant Oakley, he was returned to his cell by the Sergeant Defendants and the Correctional Officer Defendants. While escorting

Plaintiff back to his cell, these Defendants assaulted him again by punching him in the back, twisting his wrists, and threatening to break his wrists. Further, Plaintiff testified that Lieutenant Mitchell only witnessed the altercation on the yard.[4]

The incident reports state that Defendant Mallory was present in the yard, that another officer escorted Plaintiff to the healthcare unit, and that Defendant Mallory escorted another inmate to the healthcare unit. Further, the investigational interviews and incident reports state that Defendant Lee was injured during the yard incident, that Defendant Lee escorted inmates to the West House and not to the healthcare unit, and that that he did not escort Plaintiff to healthcare. Lastly, these same reports indicate that Defendants Reiman, Tourville, and Maue were involved in an altercation with other inmates and sustained injuries from that altercation which required medical treatment.

Due to the June 16, 2017 yard fight/altercation, Plaintiff was transferred from Menard. He arrived at Pontiac Correctional Center ("Pontiac") on June 17, 2017.

On June 20, 2017, Plaintiff received treatment at Pontiac for swelling and discoloration around his left eye and for an ear ache. The medical records do not indicate any further assaults other than the one that allegedly took place at Menard on June 16, 2017.

---

[4]      Plaintiff testified to the following:
         A.  To my knowledge, that was for that portion. He seen [sic] those officers basically beat me.
         Q.  Did Lieutenant Mitchell see anything in the health care unit?
         A.  No. He wasn't in – he wasn't in that batch. No.
         Q.  Was he – Lieutenant Mitchell, did see any other incidents where you allege you were hurt?
         A.  No.

(Doc. 169-3, p. 4).

If an individual in custody were to be transferred out of Menard, his grievances would not be redirected to Menard, but would go to his current facility or to the Administrative Review Board. Any grievance Plaintiff had about Menard after he was transferred to Pontiac would not come to Menard and it would not have been seen by Defendant Lashbrook, as it would have gone to Pontiac. Defendant Lashbrook does not recall Plaintiff needing or requesting any further medical treatment while housed at Menard.

Plaintiff testified that Defendant Lashbrook only had knowledge of his injuries through the grievance process; otherwise, she did not know about his injuries.[5] Plaintiff also testified that he does not know if Defendant Lashbrook knew that Plaintiff would be seriously harmed if he did not receive medical treatment.

## LEGAL STANDARDS

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014)(citing FED. R. CIV.

---

[5]     Plaintiff testified to the following:
Q.  What about Warden Lashbrook? Did she have knowledge of all those injuries or any of those injuries?
A.  I believe so through my grievance process.
…
Q.  But as you sit here today, do you know if she knew?
A.  No. I can't personally say that she did, but in my grievance – she should have known through the grievance process.

(Doc. 169-3, p. 7-8).

PROC. 56(a)). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the non-moving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, and as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## B.    Excessive Force and Failure to Intervene

The Eighth Amendment's proscription on cruel and unusual punishment extends to prohibit the use of excessive force against prisoners. The use of force is excessive when it involves the unnecessary and wanton infliction of pain. *See Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 667 (7th Cir. 2012), abrogation recognized on other grounds by *Kemp v. Fulton County*, 27 F.4th 491 (7th Cir. 2022). When prison officials are accused of using excessive force, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Several factors are relevant to this determination, including the need for force, the amount of force applied, the threat a guard reasonably

perceived, the effort made to temper the severity of the force used, and the extent of the injury caused to the prisoner. *See Hudson*, 503 U.S. at 7; *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004).

Even a bystander to the use of excessive force can be held liable under § 1983 for failure to intervene if a plaintiff can show that the officer (1) had reason to know that a fellow officer was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). A plaintiff must establish an underlying constitutional violation in order to succeed on a claim for failure to intervene. *Id.* (citing *Fillmore*, 358 F.3d at 505-506. That is to say, without establishing that at least some guards used excessive force, Plaintiff cannot succeed on a failure to intervene claim.

## C.    Deliberate Indifference to Serious Medical Needs

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–653 (7th Cir. 2005)(quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (internal quotation marks omitted). *Accord Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009)(stating that "deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."). A prisoner

is entitled to reasonable measures to meet a substantial risk of serious harm—not to demand specific care. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To prevail on such a claim, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first prong that must be satisfied is whether the prisoner has shown he has an objectively serious medical need. *See Arnett*, 658 F.3d at 750; *accord Greeno*, 414 F.3d at 653. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994)(violating the Eighth Amendment requires "deliberate indifference to a substantial risk of serious harm.") (internal quotation marks omitted).

Prevailing on the second prong requires a prisoner to show that a prison official has subjective knowledge of — and then disregards — an excessive risk to inmate health. *See Greeno*, 414 F.3d at 653. A plaintiff need not show the individual "literally ignored" his complaint, just that the individual was aware of the serious medical condition and either knowingly or recklessly disregarded it. *See Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Negligence, gross negligence, or even 'recklessness' as that term is used in tort cases, is not enough." *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987) (citation omitted). Also, "mere disagreement with the course of the inmate's medical treatment does not constitute an Eighth Amendment claim of deliberate

indifference." *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (internal quotations and citations omitted).

Assessing the second prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit explained the distinction as follows:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-806 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did," *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016) (alterations in original). However, a medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *See Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010).

## ANALYSIS

### A.   Application of *Heck v. Humphrey*

All Defendants, including Defendants Mitchell, Lee, Reiman, Tourville, Hughes, Mallory and Maue, first argue that they are entitled to summary judgment on Plaintiff's claims regarding the altercation in the yard pursuant to *Heck v. Humphrey*, 512 U.S. 477

(1994). In *Heck,* the Supreme Court held that a § 1983 action for damages is unavailable if success on the merits necessarily would imply the invalidity of a plaintiff's conviction or sentence, unless that underlying conviction or sentence has been invalidated on direct appeal, expunged by executive order, or declared invalid on habeas review. *Id.* at 486-487. *See also McDonough v. Smith*, 139 S. Ct. 2149, 2157 (2019)(stating that "to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," a § 1983 plaintiff must first "prove that his conviction had been invalidated in some way."). The Supreme Court extended the *Heck* doctrine to civil rights claims arising out of prison disciplinary hearings. *See, e.g.*, *Burd v. Sessler*, 702 F.3d 429, 434 (7th Cir. 2012), abrogated on other grounds by *Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020)(noting that claims which "necessarily imply the invalidity of the deprivation of . . . [an inmate's] good time credits" are barred by *Heck* until otherwise invalidated) (citing *Edwards v. Balisok*, 520 U.S. 641, 648 (1997)).

*Heck* prohibits a prisoner in a later civil rights case from challenging a finding that was essential to a decision in his criminal or prison disciplinary case. If the prisoner insists on doing so, the civil rights case must be dismissed. *See Moore v. Mahone*, 652 F.3d 722, 723 (7th Cir. 2011)(citing *Okoro v. Callaghan,* 324 F.3d 488, 490 (7th Cir. 2003)). *Heck* is analogous to collateral estoppel in that "an issue determined with finality in a full and fair adjudicative proceeding (and essential to the decision in that proceeding) cannot be reopened in a subsequent case." *Id.* In order to determine whether the *Heck* rule applies,

the Court must compare the factual basis of a § 1983 claim with the essential facts that supported the disciplinary action. *See Viramontes v. City of Chicago*, 840 F.3d 423, 428 (7th Cir. 2016). If the factual basis of the § 1983 claim and the disciplinary decision are contradictory, the lawsuit must be dismissed without prejudice so long as the disciplinary decision remains in place and is valid. *Id.*

Here, Defendants argue that the findings of the Adjustment Committee require dismissal of Plaintiff's claims as to the altercation on the yard against all Defendants, including Mitchell, Lee, Reiman, Tourville, Hughes, Mallory and Maue. Plaintiff, however, argues that he can take an "agnostic posture," neither confirming nor denying the prior findings of the Adjustment Committee. According to Plaintiff, he does not need to concede to these facts nor deny that he did anything wrong because it is possible that Defendants acted with excessive force, failed to intervene, violated his constitutional rights, and committed assault and battery.

The Court first considers the facts underlying Plaintiff's disciplinary decision. The Adjustment Committee's complaint against Plaintiff alleged the following:

> Offender TITUS, Adam R43512 is being issued this disciplinary report based on the findings of an External investigation that was initiated on 6/16/2017. On 6/16/2017 multiple staff was [sic] assaulted while 5 and 8 galleries of the West Cell House were being escorted from the Multi-Purpose Building back to the West Cell House. Multiple offenders began striking staff members with closed fist punches. Multiple direct orders were given for offenders to stop fighting and get on the ground but all were ignored. As a result, two warning shots were fired and O.C. pepper spray was used in order to gain compliance. The Menard Security Camera System was utilized and revealed offender TITUS left the pat search area and ran to the area where staff was attempting to restrain one of the inmates involved in the initial assault on staff. TITUS was given orders to lie on the ground but refused and charged a group of staff members who were attempting to secure other offenders. TITUS began

swinging closed fist punches at the group of staff members striking them in various areas across the back of the head, face, and torso. This was verified by the Camera system and was identified by three staff members who had to physically restrain TITUS with mechanical restraints after he refused several direct orders to stop resisting. Due to offender TITUS being identified on camera and by three staff members, assaulting staff, TITUS R43512 is being charged with violating Departmental Rules 504A: 100-Violent Assault, 102a – Assault with injury, 105-Dangerous Disturbance and 313–Disobeying a Direct Order. Offender TITUS was identified by his state ID card and Offender 360.

(Doc. 169-1, p. 4-5). Plaintiff entered no plea and provided a written statement which stated he was not guilty. During the hearing, however, Plaintiff admitted to striking officers. Thus, Plaintiff was found guilty of 102a–Assault with injury: striking staff with closed fist and 105-Dangerous Disturbances: multiple offenders. (Doc. 169-1, p. 2). Plaintiff received restrictions to his visits, audio/visual and contact visits, C Grade, restrictive housing, and good conduct credit revocation of three (3) months, which was later reduced to one (1) month. (Doc. 169-1, p. 3; Doc. 169-2, p. 3).

What is clear from the record is that Plaintiff admitted he struck staff in the course of proceedings that have not been invalidated. If this case involved issues related to the discipline Plaintiff received, then it would have to be dismissed pursuant to *Heck*. This case, however, is more complicated, in that Plaintiff alleges he was beaten repeatedly and denied medical care for the altercation in the yard; he was also beaten during his transport to healthcare, while in healthcare, and on the way to restrictive housing.

In assessing whether his § 1983 claims are barred by *Heck*, the Court looks to the Seventh Circuit cases of *Helman v. Duhaime*, 742 F.3d 760 (7th Cir. 2014) and *Evans v. Poskon*, 603 F.3d 362 (7th Cir. 2010). In *Evans*, police burst into the plaintiff's home, believing he was attempting to strangle someone. The police arrested the plaintiff after a

struggle. Evans was convicted of attempted murder and resisting arrest. He subsequently filed suit pursuant to § 1983 alleging that the arresting officers used excessive force during and after his arrest. The Seventh Circuit held that Evans could not maintain an action premised on the claim that he did not resist being taken into custody. However, he could proceed with claims that the police used excessive force in effecting his custody and after he was in custody. *See Evans*, 603 F.3d at 363-364.

The *Helman* court considered *Evans* in the context of a plaintiff who was convicted of resisting arrest. The plaintiff was shot by police officers because he attempted to draw a weapon during the execution of an arrest warrant. Helman pleaded guilty, but he filed an excessive force claim against the arresting officers for shooting him. *See Helman*, 742 F.3d at 761-762. The Seventh Circuit found that Helman's "only viable theory of § 1983 liability [wa]s Helman's theory that he did not attempt to draw his weapon until after shots were fired at him." *Id*. at 762-763. The Court determined that such a theory necessarily implied the invalidity of Helman's conviction. Taken together, *Evans* and *Helman* suggest that the timing of and interaction between the offense conduct leading to a conviction and the alleged use of excessive force are important factors in determining whether a § 1983 action is barred by *Heck*.

Here, Plaintiff's claims are more closely aligned with the plaintiff's claims in *Evans*. Even accepting that Plaintiff admitted to striking staff during the first altercation in the yard, that does not negate the possibility that Defendants, like the officers in *Evans*, could have used excessive force in subduing Plaintiff and while transporting Plaintiff to healthcare and to segregation. Plaintiff's claims do not imply the invalidity of the

underlying Adjustment Committee findings/proceedings. As such, Plaintiff's claims are not barred by *Heck*. Thus, the Court denies this portion of the partial motion for summary judgment.

**B.    Excessive Force, Failure to Intervene, Deliberate Indifference, Battery and Assault claims against Lee, Reiman, Mallory, Tourville and Maue – Counts 1-5[6]**

Defendants further challenge Plaintiff's claims against Lee, Reiman, Tourville, Maue, Lee, and Mallory contending that the records and the undisputed facts demonstrate that these Defendants were not involved in any altercation with Plaintiff. Specifically, these Defendants claim that they did not escort Plaintiff to the healthcare unit. Therefore, they could not have been involved in the assault, battery, and use of excessive force. Nor could they have showed any deliberate indifference or failed to intervene on Plaintiff's behalf. Defendants further argue that Plaintiff's version of the facts, *i.e.*, that Defendants Lee, Reiman, Mallory, and Tourville escorted him to the healthcare unit after the altercation in the yard and that Defendant Maue was involved in the assault at the healthcare unit, are not supported by the evidence. According to Defendants, Defendant Mallory was only present during the yard incident and did not escort Plaintiff to the healthcare unit as Defendant Mallory escorted a different individual to the healthcare unit. *See* (Doc. 169-11). Also, Defendants maintain that Defendant Lee was injured during the yard incident, that Defendant Lee was only present during the

---

[6]    Defendants' section of the brief in support of partial summary judgment includes arguments as to Defendant Maue even though his name is not included in the heading of the section. *See* (Doc. 169, p. 15). Plaintiff did not address Defendant Maue in his brief in opposition. Despite Defendant Maue not being named in the heading, the Court will address the arguments presented by Defendant Maue in the memorandum in support of the motion for partial summary judgment.

yard incident, and that Defendant Lee escorted inmates to the West House and not to the healthcare unit. *See* (Doc. 169-13, 203-204). Lastly, Defendants contend that Defendants Reiman, Tourville, and Maue were involved in an altercation with another inmate and sustained injuries from that altercation which required medical treatment. *See* (Doc. 169-12, p. 11; Doc. 169-13, p.214-216; Doc. 169-13, p. 232-235; Doc. 169-13, p. 266-269). Plaintiff counters that Defendants' reports are self-serving, that Defendants do not address the factual discrepancies, and that Defendants completely ignore Plaintiff's version of the facts.

Based on the record before the Court, the Court agrees with Plaintiff that there are genuine issues of material fact that must be decided by a jury. Plaintiff claims that Defendants Lee and Reiman were the officers that originally tackled him in the prison yard and that Defendants Mallory and Tourville jumped in to help subdue Plaintiff. Plaintiff further claims that these four Defendants punched and beat him while attempting to restrain him. Regarding the escort to healthcare, Plaintiff testified that Defendants Lee, Reiman, Mallory, Maue, and Tourville dragged him on the ground, called him names, and punched and kneed him in the back, body, and head. They also did not stop beating him until he arrived at the healthcare unit and sat him on the bench. Plaintiff also testified that he was able to identify these Defendants as he was familiar with them. Plaintiff furthermore testified that Defendants Lee, Tourville, Reiman, Maue, and Mallory assaulted him in the healthcare unit and that Reiman witnessed it. Defendants Reiman, Mallory, Maue, and Lee then took him from the healthcare unit to segregation. Plaintiff's allegations and testimony are in direct conflict with the evidence

presented by Defendants. Plaintiff's testimony is sufficient to establish a level of personal involvement as to these Defendants. Thus, the Court finds that there are material disputes of fact and credibility issues that must be decided by a trier of fact. Accordingly, the Court finds that summary judgment as to these Defendants is not appropriate.

### C.   Deliberate Indifference claim against Defendant Oakley and Defendant Lashbrook – Count 3

#### 1.   Defendant Oakley

For the purposes of this motion and based on the record before the Court, the Court finds that the injury to Plaintiff's eye along with his other alleged injuries constitute objectively serious medical conditions. Thus, the Court must determine, based on that same record and construing the evidence in the light most favorable to Plaintiff, whether Defendant Oakley was deliberately indifferent to Plaintiff's serious medical needs.

The parties do not agree that the medical records accurately reflect Plaintiff's condition/conditions and treatment from Defendant Oakley, with Plaintiff pointing to documentation of additional and more serious injuries by healthcare staff at Pontiac after his transfer, including the swelling of his eye. While there could be innocent explanations, like delays in the appearance of contusions and abrasions, those determinations are best left to a trier of fact. As such, the Court finds that Defendant Oakley is not entitled to summary judgment on Plaintiff's deliberate indifference claim.

#### 2.   Defendant Lashbrook

Defendants argue that Defendant Lashbrook is entitled to summary judgment as she was not deliberately indifferent to Plaintiff's serious medical needs because she could not have reviewed Plaintiff's grievance. Specifically, Defendants argue that Lashbrook

does not recall Plaintiff needing or requesting further medical treatment while in Menard. Further, Defendants argue that Plaintiff's grievances regarding medical care would not have gone to Defendant Lashbrook because Plaintiff was transferred to Pontiac right after the June 16, 2017 altercation.

In response to Defendants' motion for partial summary judgment, Plaintiff does not address this issue. The Court considers this failure to respond as an admission of the merits. *See* SDIL Local Rule 7.1(c)(1); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). *See also Flynn v. Sandahl*, 58 F.3d 283, 288 (7th Cir. 1995)(noting that a failure to respond constitutes an admission that there are no undisputed material facts). Thus, the Court finds that Defendant Lashbrook was not deliberately indifferent to Plaintiff's serious medical needs and that Defendant Lashbrook is entitled to summary judgment on Count 3 of Plaintiff's Second Amended Complaint.

## D.     Qualified Immunity

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. It protects an official from suit "when she makes a decision that, even if

constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232. *See also Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). To be "'clearly established', a right must be defined so clearly that every reasonable official would have understood that what he was doing violated that right." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015)(citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The right must be established "not as a broad general proposition." *Reichle*, 566 U.S. at 664. Instead, it must be "particularized" such that the "contours" of it are clear to a reasonable official. *Id*. That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014).

Defendant Lashbrook is entitled to qualified immunity because, even when the facts are viewed in the light most favorable to Plaintiff, she engaged in no conduct that violated Plaintiff's constitutional rights as alleged in Count 3. As to all other claims against Defendants, Defendants' conduct could be said to have violated Plaintiff's constitutional rights such that they are not entitled to qualified immunity.

## CONCLUSION

Accordingly, the Court **GRANTS in part** and **DENIES in part** Defendants' motion for partial summary judgment. (Doc. 168). The Court **GRANTS** the motion as to the claim against Defendant Lashbrook in Count 3 and **FINDS** that she is entitled to qualified immunity. At the close of the case, the Clerk of the Court shall enter judgment in favor of Defendant Jacqueline Lashbrook and against Adam Titus on Count 3 of the Second Amended Complaint.

The Court **DENIES** Defendants' motion in all other regards, and the following claims remain pending:  Count 1 (Excessive Force), Count 2 (Failure to Intervene), Count 3 (Deliberate Indifference to Medical Needs) against all Defendants except Defendant Lashbrook, Count 4 (Battery), and Count 5 (Assault).

The Court **DIRECTS** the Clerk of the Court to set this matter for a telephone status conference to discuss the possibility of a settlement conference and potential trial dates.

**IT IS SO ORDERED**.

**DATED: September 22, 2022.**

Digitally signed by Judge Sison 2
Date: 2022.09.22 14:34:05 -05'00'

_____

**GILBERT C. SISON**
**United States Magistrate Judge**